**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

_____

|                                    |       |                          |
|------------------------------------|-------|--------------------------|
| **FELIX GONZALEZ,**                | )     | **Civil Action No.**     |
|                                    | )     | **19-01427-FDS**         |
| **Plaintiff,**                     | )     |                          |
|                                    | )     |                          |
| **v.**                             | )     |                          |
|                                    | )     |                          |
| **ANDREW SAUL, Commissioner,**     | )     |                          |
| **Social Security Administration,**| )     |                          |
|                                    | )     |                          |
| **Defendant.**                     | )     |                          |

_____)

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION**
**FOR ORDER REVERSING THE COMMISSIONER'S DECISION**

**SAYLOR, C.J.[1]**

This is an appeal from the final decision of the Commissioner of the Social Security

Administration denying an application for social security disability insurance ("SSDI").  Plaintiff

Felix Gonzalez alleges that he became disabled on February 7, 2014, after depression rendered

him unable to work.  He now disputes the Commissioner's holding that he is not "disabled"

within the meaning of the Social Security Act.

Pending before the Court is Gonzalez's appeal and the Commissioner's motion to affirm.

For the reasons stated below, Gonzalez's motion to reverse and remand will be granted and the

Commissioner's motion to affirm will be denied.

**I.**     **Background**

The following is a summary of the relevant evidence in the administrative record

_____

[1] Of the District of Massachusetts, sitting by designation.

("A.R.").

### A.    Education and Occupational History

Felix Gonzalez was born on February 21, 1961, and is currently 60 years old.  (A.R. at 122).  He was almost 53 years old at the alleged onset of his disability on February 7, 2014.  (*Id.* at 134).  He holds a GED, does not speak or understand English, and communicates in Spanish. (*Id.* at 263, 265).  As of 2019, he resided in Puerto Rico with his partner.  (*Id.* at 35, 120).

Gonzalez worked from 1979 to 1982 as a security guard, from 1990 to 1993 and from 2001 to 2003 as a truck driver, and from 2004 to 2014 as a warehouse manager.  (*Id.* at 49, 265). He last reported earnings in 2015, and has not performed substantial work since February 2014. (*Id.*).[2]

### B.    Medical History

Gonzalez alleges that he is unable to work due to depression.  (*Id.* at 264).

Dr. Jose Lopez Marquez, M.D., a psychiatrist, began treating Gonzalez on March 24, 2014, and treated him on a monthly basis through March 3, 2015.  (*Id.* at 73, 129-32).  At his first appointment, Gonzalez reported a host of symptoms, including the following:  sadness, nervousness, agitation, fear of losing control, constant worrying, feelings of fear, fear of going crazy, an increase in appetite, headaches, chills, sleeping too much, nightmares, fear of dying, restlessness, excitation, tension or pressure, weakness, feeling worthless, memory problems, seeing or hearing things that are not real, thoughts of death or suicide, insomnia or difficulty sleeping, sweaty hands or legs, a decrease in libido, feeling powerless, negative or racing thoughts, chest agitation, and anxiety attacks.  (*Id.* at 73, 82-83).  Dr. Lopez Marquez noted that

---

[2] The record indicates that in 2015, after Gonzalez filed his application for benefits, he was employed by a municipality for approximately two months.  (*Id.* at 37).

Gonzalez appeared healthy, but that he was hypoactive with slow/soft language, sad, and depressed. He further noted that his thoughts were logical, coherent, and relevant, but that he had a reserved attitude and restricted affect. He found that he was oriented as to time, place, and person; his memory was normal; his concentration was mildly limited; his social and evidentiary judgment were compromised; and his insight was diminished. (*Id.* at 86). He concluded that Gonzalez was suffering from depression, and diagnosed a global assessment of functioning ("GAF") score of 40 and an Axis I score of 296.32, indicating severe recurrent major depressive disorder with psychotic features, and assessed his prognosis as poor. (*Id.*; Opp. at 4 (noting that his Axis I score corresponds to severe recurrent major depressive disorder with psychotic features)).[3] He prescribed 10 mg. of Prozac, 5 mg. of BuSpar, and 25 mg. of Vistaril. (*Id.* at 79, 88).[4]

On April 28, 2014, Gonzalez reported to Dr. Lopez Marquez that he felt depressed, irritable, angry, feeling useless, anxious, restless, exhausted, and forgetful, and that he was experiencing visual and auditory hallucinations and suicidal or homicidal thoughts. (*Id.* at 89). Dr. Lopez Marquez found him cooperative and affable, and his communication logical, coherent, and relevant, but noted that his attention, judgment, concentration, and introspection were

---

[3] According to the Commissioner's memorandum, a GAF score between 31 and 40 is associated with "some impairment in reality testing or communication (i.e., speech is sometimes illogical, obscure, or irrelevant), and a major impairment in several areas such as work, school, family relations, judgment, thinking, or mood (i.e., depressed man avoids friends, neglects family, and is unable to work)." (Mem. n. 2 (quoting Diagnostic and Statistical Manual of Disorders, Fourth Edition (DSM-IV) 34 (4th Ed. 2000)).

[4] A progress note from his first visit indicates that Dr. Lopez Marquez prescribed him 50 mg. of BuSpar; however, a form describing his initial treatment listed the amount as 5 mg., and that appears more consistent with the rest of the prescriptions described in Dr. Lopez Marquez's progress notes. (*Compare id.* at 79 *with* 88).

inadequate.  (*Id.* at 90).[5]  He assessed a GAF score of 45,[6] an Axis I score of 296.32 with a poor prognosis, and increased one of Gonzalez's medications, Prozac, by 10 mg.  (*Id.* at 90-91).

On June 24, 2014, he increased Gonzalez's BuSpar prescription to 10 mg.  (*Id.* at 97; *but see id.* at 80 (indicating that it may have been increased on May 30, 2014)).[7]  On July 31, 2014, Gonzalez reported similar symptoms, but indicated that his suicidal or homicidal thoughts had worsened.  (*Id.* at 98).  Dr. Lopez Marquez kept his medication protocol the same but recommended that he be hospitalized on an emergency basis because he was a danger to himself and to others.  (*Id.* at 100-01).  The services were not approved by Gonzalez's insurance.  (*Id.* at 76).

On August 25, 2014, Dr. Lopez Marquez made similar assessments and again recommended that Gonzalez be hospitalized because he was a danger to himself.  (*Id.* at 105).  It does not appear from the record that he was hospitalized at that time.  On September 25, 2014, Dr. Lopez Marquez added 0.5 mg. of Haldol to Gonzalez's medication protocol.  (*Id.* at 80, 106-08).  On October 28, 2014, he increased his Prozac prescription to 40 mg. and his Vistaril prescription to 50 mg.  (*Id.* at 111; *but see id.* at 80 (indicating that they may have been increased

---

[5] He found that plaintiff had inadequate attention, concentration, judgment, and introspection in every progress note except for his progress note for the March 24, 2014 visit, which used a form that had different questions.  (*Id.* at 93, 96, 99, 103, 107, 110, 113, 116, 130).  That form asked about Gonzalez's memory, concentration, social and evidentiary judgment, and insight, but had more options for answers than the other form, which had only two choices—inadequate or adequate.  (*Compare id. with id.* at 86).

[6] According to the Commissioner's memorandum, a GAF score between 41 and 50 is associated with "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  (Mem. n. 3 (quoting Diagnostic and Statistical Manual of Disorders, Fourth Edition (DSM-IV) 34 (4th Ed. 2000)).

[7] Dr. Lopez Marquez assessed Gonzalez's Axis I score as 296.32 with a poor prognosis at every visit except for the June 24, 2014 visit.  (*Id.* at 96).  At that visit, he assessed his Axis I score as 296.34.  (*Id.*).  Both appear to indicate a severe recurrent major depressive disorder with psychotic features.  (Opp. at 4 (noting that such Axis I scores correspond to severe recurrent major depressive disorder with psychotic features)).

In addition, in every progress note except for the March 24, 2014 progress note, he assessed a GAF score of 45.  (*Compare* A.R. at 93, 96, 99, 103, 107, 110, 113, 116, 130 *with id.* at 86).

on November 25, 2014)).  On November 25, 2014, he increased Gonzalez's Haldol prescription to 1 mg.  (*Id.* at 80, 114).

On December 5, 2014, Gonzalez filed a function report in support of his application for social security.  He attested that he lived with his family; that his partner helped him to get dressed, to care for his hair, and to shave; and that his family reminded him to bathe, to take his medication, and to go to his monthly medical appointments.  (*Id.* at 57-59, 61).  According to Gonzalez, he left the house approximately three times a week either walking, driving, or as a passenger in an automobile.  (*Id.* at 60).  He attested that he took the garbage out and accompanied his partner shopping, but that he had bad thoughts, got confused easily, was unable to concentrate, and spent all day watching television.  (*Id.* at 57-60).  He further attested that his illness affected his memory, intellect, and ability to follow instructions, but that he could follow short written and spoken instructions.  (*Id.* at 62).  He reported that he got along normally with authority figures and that his medication did not have side effects.  (*Id.* at 63-64).  On April 14, 2015, Gonzalez filed another function report, the content of which was essentially the same.  (*Id.* at 65-72).

On December 9, 2014, Dr. Lopez Marquez compiled a psychiatric medical report based on nine sessions with Gonzalez from March 24 through November 25, 2014.  (*Id.* at 73-81).  He reported that Gonzalez had experienced traumatic events that provoked the deterioration of his mental health and affected his ability to cope with stressful situations.  (*Id.* at 74).  He further reported that Gonzalez was anxious, unstable, and unpredictable, had lost the ability to understand and respond to stressful events, and had made structured suicide attempts.  (*Id.* at 74, 78).

The report noted that Gonzalez limited his social interactions to his immediate family;

that his thinking was logical, coherent, and relevant; and that he responded to questions in an understandable manner.  (*Id.* at 75).  He reported that he only left the house for his medical appointments, and was accompanied by his partner, relatives, or friends.  (*Id.* at 75, 78).  He was oriented to person and place, but not to time, and was mildly limited as to his recent and immediate memory.  (*Id.* at 76-77).

Dr. Lopez Marquez found that because of his condition, Gonzalez was unable to carry out any type of work, to follow instructions, or to complete the tasks of a job.  (*Id.* at 74, 79).  In his opinion, Gonzalez could not handle his own funds.  (*Id.* at 81).  He diagnosed severe recurrent major depression with psychotic features, assessed a GAF score of 40, and determined that Gonzalez's prognosis was poor with no improvement expected over the following year.  (*Id.* at 80-81).  After the report, Dr. Lopez Marquez saw him three more times on December 30, 2014, February 24, 2015, and March 3, 2015.  (*Id.* at 115-17, 129-32).

### C.    Residual Functional Capacity Assessments and Related Opinions

On January 21, 2015, Dr. Roberto Irizarry Rivera, a psychologist, conducted a consultative psychiatric examination, which was requested for Gonzalez's application for SSDI. (*Id.* at 118-25).  According to the report, Gonzalez reported feeling depressed, irritable, and hopeless, and stated that he had decreased interest and pleasure in daily activities, insomnia, and a loss of energy.  (*Id.* at 120).  He explained his situation to Dr. Irizarry Rivera as follows:

> I stopped working in 2014 because of my emotional condition.  At work my supervisor would abuse me verbally; he would harass me and scold me like a child.  During that time[,] I thought about killing my boss with a fork lift.  I feel depressed, I cry easily, [I have] thoughts of taking my own life, problems sleeping[,] and I close myself up in the house.

(*Id.* at 120-21).

Dr. Irizarry Rivera recorded that Gonzalez was taking the medication protocol prescribed by Dr. Lopez Marquez:  40 mg. Prozac, 50 mg. Vistaril, 10 mg. BuSpar, and 1 mg. Haldol.  (*Id.*

at 120).[8]  Upon examination, he observed that Gonzalez presented a depressed mood and affect, did not make eye contact, and had slow psychomotor activity.  (*Id.* at 121).  He noted that he displayed coherent, relevant, and logical thought form, established a good rapport, and answered all questions during the evaluation.  (*Id.*).  He further noted that he was not experiencing suicidal or homicidal ideations at the time of his examination; that his immediate, short-term, and recent memory, as well as his attention and concentration levels, were adequate; and that his general knowledge, social judgment, and insight were slightly diminished.  (*Id.* at 121-22).  Those determinations were based on Gonzalez's answers to several questions.  However, another section of his report stated that Gonzalez's insight and social judgment were "adequate" while his attention and concentration levels were "slightly diminished."  (*Id.* at 123).  To test his "social judgment," Dr. Irizarry Rivera asked him what he would do if he found a wallet with an ID and $100 (he answered that he would not take it), what he would do if he saw his neighbor's house on fire (he answered that he would run away), and how to avoid bad companies (he said I don't know); to test his "attention and concentration level[s]" he asked him to list the days of the week forward and backward, which he was able to do.  (*Id.* at 121-22).  It is not clear from his report how he tested his "insight" levels.  (*Id.*).  He also concluded that Gonzalez could handle his funds.  (*Id.* at 123).

Dr. Irizarry Rivera diagnosed moderate, recurrent major depressive disorder without psychotic features, a GAF score of 50, and prognosis of "reserved."  (*Id.*).

On January 27, 2015, Dr. Hugo Roman Rivera, Ph.D., a state agency psychological consultant, reviewed the record and assessed Gonzalez's residual functional capacity ("RFC").

---

[8] Dr. Irizarry Rivera recorded the medications in his report by their generic names rather than by the brand names listed by Dr. Lopez Marquez.  (*Compare* A.R. at 80 *with* A.R. at 120).

(*Id.* at 139-43).  Dr. Roman Rivera diagnosed moderate major depression involving moderate restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.  (*Id.* at 139).  He found that Gonzalez had moderate limitations in his ability to (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) respond appropriately to changes in the work setting; (11) travel in unfamiliar places or use public transportation; and (12) set realistic goals or make plans independently of others.  (*Id.* at 141-43).

Dr. Roman Rivera noted that Gonzalez presented as logical, coherent, and well-oriented, and that he had a good rapport, adequate memory except for his short-term memory, good attention and concentration levels, and slightly diminished judgment and insight levels.  (*Id.* at 141).  He proposed a "flexible MRFC" and stated that although Gonzalez was depressed, which could affect his performance of detailed or complex tasks, he was able to execute a two-step simple command, persist at tasks for two-hour intervals, interact with others, and adjust to changes.  (*Id.* at 143).  He found that Dr. Lopez Marquez's opinion was without substantial support in other evidence of the record; that Gonzalez was not disabled; and that he was able to perform his past relevant work as a warehouse supervisor.  (*Id.* at 144-45).

8

On March 3, 2015, Gonzalez was admitted to First Hospital Panamericano in Cidra, Puerto Rico.  (*Id.* at 126-128).  Upon admission, Maria Cordova Gonzalez, M.D., a psychiatrist, reported that Gonzalez presented depressive symptomology, auditory and visual hallucinations, and suicidal ideation with a structured plan, and that he was seeking hospitalization on a voluntary basis.  (*Id.*).  While hospitalized, he received individual therapy with a psychiatrist and social worker, group and recreational therapies, and drug therapy.  (*Id.* at 127).  She diagnosed major severe depression without psychosis, and assessed a GAF score of 55-60.  (*Id.* at 128).[9]

At the time of his discharge on March 10, 2015, Dr. Cordova Gonzalez reported that he had achieved a total remission of suicidal ideation, psychosis, and hallucinations.  (*Id.* at 127).  She ruled out malingering, noting that "[he] is focused on receiving Social Security [benefits]" but also that "[a]t the moment it cannot be ruled out that there is a secondary gain, so malingering is ruled out at the time of discharge [sic]."  (*Id.* at 127).  At discharge, he was also determined to be "stable" and "oriented in all three spheres."  (*Id.*).  He demonstrated logical, consistent, and relevant communication, a euthymic mood, and was alert.  (*Id.*).  He was prescribed 40 mg. Prozac, 1 mg. Risperdal, and 50 mg. Vistaril.  (*Id.* at 127).

On April 22, 2015, Dr. Luis Umpierre, a state agency psychological consultant, assessed Gonzalez and reviewed Dr. Roman Rivera's January 2015 evaluation.  (*Id.* at 153).  He concluded that despite Gonzalez's contentions of worsening depression and his recent hospitalization, there were no substantial changes in his functional limitations and that the prior assessment was substantially correct.  (*Id.*).  He affirmed Dr. Roman Rivera's medical

---

[9] According to the Commissioner's memorandum, a GAF score between 51 and 60 is associated with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)."  (Comm'r Mem. n. 4 (quoting Diagnostic and Statistical Manual of Disorders, Fourth Edition (DSM-IV) 34 (4th Ed. 2000))).

assessment of Gonzalez's abilities, and agreed that "the prior decision rationale was correctly presented and resolved," but did not think that Gonzalez had the RFC to perform previous relevant work.  (*Id.* at 153, 159-60).  He believed that Gonzalez was limited to unskilled work consisting of simple tasks, and therefore capable of performing the following jobs that exist in significant numbers in the national economy:  peeled potato inspector; sausage inspector; and outside deliverer.  (*Id.*).

### D.     Procedural Background

Gonzalez applied for SSDI benefits on November 13, 2014, alleging that he became disabled because of his depression on February 7, 2014.  (*Id.* at 252).  His application was initially denied on January 28, 2015, and on reconsideration on May 13, 2015.  (*Id.* at 42-43, 46-47).  He requested a hearing before an administrative law judge ("ALJ") on June 1, 2015. (*Id.* at 33).  That hearing was held on May 17, 2017.  (*Id.* at 33, 171-72).

On June 29, 2017, the ALJ issued his decision concluding that Gonzalez was not disabled.  (*Id.* at 18).  On July 17, 2017, Gonzalez timely requested a review of the decision by the Appeals Council.  (*Id.* at 250).  On March 2, 2019, the Appeals Council declined that request. (*Id.* at 1-3).  This appeal followed.

## II.     Analysis

### A.  Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's factual findings, "if supported by substantial evidence, shall be conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ."  *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001) (citation omitted); *see Evangelista v. Sec'y of Health &*

*Hum. Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision when the ALJ ignored evidence or made legal or factual errors.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D. Mass. Mar. 2, 2013) (citation omitted) ("[I]f the ALJ made a legal or factual error, the Court may reverse or remand such decision . . . .").  Accordingly, if the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court cannot conclude that there is substantial evidence in the record to support the Commissioner's decision."  *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation.").  Questions of law are reviewed *de novo*.  *Seavey*, 276 F.3d at 9.

**B.**      **Standard for Entitlement to SSDI Benefits**

An individual is not entitled to SSDI or SSI benefits unless he or she is "disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(d) (setting forth the definition of disabled in the context of SSDI); *id.* §§ 1382c(a)(1), 1382c(a)(3) (same in the context of SSI).  "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than" 12 months.  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  The impairment must be severe enough to prevent a claimant from performing

not only past work, but also any substantial gainful work existing in the national economy.  *See*

20 C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a

claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application
> is denied; 2) if the applicant does not have, or has not had . . . a severe impairment
> or combination of impairments, the application is denied; 3) if the impairment
> meets the conditions for one of the 'listed impairments' in the Social Security
> regulations, then the application is granted; 4) if the applicant's 'residual
> functional capacity' is such that he . . . can still perform past relevant work, then
> the application is denied; 5) if the applicant, given his or her residual functional
> capacity, education, work experience, and age, is unable to do any other work, the
> application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).  "The applicant has the burden of

production and proof at the first four steps of the process," and the burden shifts to the

Commissioner at step five to "com[e] forward with evidence of specific jobs in the national

economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir.

2001).  At that juncture, the ALJ assesses the claimant's RFC in combination with the

"vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. §

404.1560(c)(1), to determine whether the claimant can "engage in any . . . kind of substantial

gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

**C.**   **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20

C.F.R. § 404.1520(a)(4).

At the first step, the ALJ found that Gonzalez had not engaged in substantial gainful

activity during the period since his alleged disability onset date of February 7, 2014.  (A.R. at

20).

At step two, the ALJ considered the medical severity of his impairments and found Gonzalez to have severe major depressive disorder that resulted in significant limitations to his ability to perform basic work activities.  (*Id.*).

At step three, the ALJ found that Gonzalez's severe impairment did not meet the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.*).  He stated that Gonzalez's depression did not satisfy Listing 12.04, paragraph B criteria, which requires an extreme limitation of one, or a marked limitation of two, of the following four areas of mental functioning:  understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (*Id.* at 22). Based on the medical record, the ALJ concluded that the paragraph B criteria were not met because Gonzalez had moderate limitations in understanding, remembering, or applying information, moderate limitations in interacting with others, moderate limitations in concentrating, persisting, or maintaining pace, and mild limitations in adapting or managing himself.  (*Id.*).  He also determined that the extreme limitations alleged by Gonzalez were out of proportion to the expected effects of his depression.  (*Id.* at 23).

At step four, the ALJ concluded that Gonzalez's RFC precluded him from performing any past relevant work because his previous jobs were either semi-skilled or skilled.  (*Id.* at 25). Gonzalez had the RFC to understand, remember, and carry out short, simple, and repetitive instructions and tasks, and he could frequently respond appropriately to supervision, coworkers, usual work situations, and changes in a routine work setting, though only when he was not dealing with the public.  (*Id.* at 23-24).

In considering Gonzalez's symptoms to make that finding, the ALJ followed a two-step

13

process.  He first considered whether there were any underlying medically determinable physical or mental impairments—that is, impairments that could be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce Gonzalez's symptoms.  (*Id.* at 24).  Second, he evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limited Gonzalez's functional limitations.  (*Id.*).  For that purpose, whenever statements about that intensity, persistence, and limiting effect were not substantiated by objective medical evidence, he considered other evidence in the record to determine if the symptoms limited the ability to perform work-related activities.  (*Id.*).

The ALJ found that although the objective evidence established the presence of medical impairments that could reasonably be expected to cause the alleged symptoms, the record did not establish a "disabling frequency and intensity" that would prevent Gonzalez from performing simple, routine work activity.  (*Id.*).  He looked to Gonzalez's medical and mental-health treatment, his adequate interpersonal relationship with his partner, his medication, his regular attendance at medical appointments, and his lack of persistent disabling psychotic or depressive pathology.  (*Id.*).  He gave partial weight to the opinions of Dr. Lopez Marquez, the First Hospital Panamericano health professionals, Dr. Irizarry Rivera, Dr. Roman Rivera, and Dr. Umpierre.  (*Id.* at 24-25).  He noted that Dr. Irizarry Rivera's reserved prognosis conflicted with the diagnosis of moderately intense depression, and that the RFC assessments from Dr. Roman Rivera and Dr. Umpierre for simple, unskilled work did not account for Gonzalez's inability to deal with the public.  (*Id.* at 25).  He then concluded that Dr. Lopez Marquez's GAF scores were inconsistent with the mental condition described and in conflict with the record, and he afforded partial credibility to the GAF score of 55 from the medical professionals at First Hospital

Panamericano.  (*Id.*).

At step five, the ALJ considered Gonzalez's age, education, work experience, RFC, and the Medical-Vocational Guidelines and found that there were jobs that existed in significant numbers in the national economy that he could perform.  (*Id.* at 26); *see* 20 C.F.R. § 404, Subpart P, Appendix 2.  Because Gonzalez's ability to perform work at all exertional levels was compromised by non-exertional limitations, the ALJ consulted a vocational expert.  (*Id.*).  The vocational expert testified that an individual with Gonzalez's characteristics would be able to perform the following jobs:  assembler of plastic hospital products; bottling line attendant; and cigar inspector.  (*Id.*).  The ALJ therefore concluded that Gonzalez could successfully adjust to other work that exists in significant numbers in the national economy and was not disabled within the meaning of the Social Security Act.  (*Id.* at 27).

### D.   Plaintiff's Objections

Gonzalez contends that the ALJ erred because (1) he failed to provide a reasonable explanation for his assessment of Gonzalez's ability to concentrate, persist, or maintain pace and to adapt or manage himself; and (2) the ALJ did not give controlling weight to the opinion of the treating physician and failed to adequately explain that decision.

#### 1.   Explanation of Findings

Gonzalez first contends that the ALJ failed to comply with 20 C.F.R § 404.1520a(e)(4) because the ALJ did not provide a reasonable explanation for the determination that he was moderately limited in his ability to concentrate, persist, and maintain pace, and mildly limited in his ability to adapt or manage himself.  (Pl. Mem. at 19).

Section 404.1520a outlines a "special technique" that an ALJ must follow in determining the severity of a claimant's mental impairment.  As part of that technique, the ALJ must make a specific finding as to the claimant's degree of limitation in four broad functional

15

areas:  understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  20 C.F.R. 404.1520a(b)(3), (e)(4) (effective January 16, 2017).[10]  The ability to adapt or manage oneself concerns "the ability to regulate emotions, control behavior, and maintain well-being in the work setting."  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00E(4).

In his decision, the ALJ specifically found that Gonzalez had "moderate limitations in understanding, remembering, or applying information, moderate limitations in interacting with others, moderate limitations in concentrating persisting or maintaining pace, and mild limitations in adapting or managing oneself."  (A.R. at 22).  Gonzalez contends that the ALJ did not explain how he made two of those determinations—specifically, that he is moderately limited in his ability to concentrate, persist, and maintain pace, and mildly limited in his ability to adapt or manage himself.  But a review of the ALJ's decision shows otherwise.  In his decision, he cited Dr. Lopez Marquez's assessment that "the claimant's concentration was not significantly decreased"; Dr. Irizarry Rivera's assessment that his "attention" and "concentration" were adequate; and the assessment of the medical professionals at First Hospital assessment that his "concentration" and "attention" were adequate.  (*Id.* at 21, 23).  He referred to Gonzalez's statements that he was able to "take out the garbage, walk, travel as passenger, drive short distances and go shopping with his partner sometimes," "attend[] medical appointments regularly," and "relate[] normally with figures of authority."  (*Id.* at 23).  He further noted that Gonzalez had provided a "good, detailed history" of his "work history" and that his "contact with reality" does not appear "significantly impaired" based on the progress notes of Dr. Lopez

---

[10] The four broad functional areas were amended effective January 17, 2017.  The parties appear to agree that the amended version of the regulations applies.  (*Compare* Mem. at 19 *with* Opp. at 15).

Marquez.  (*Id.*).  Additionally, the ALJ noted that "the claimant has understood and followed his prescribed treatment and is stable with the same."  (*Id.*).  He also cited the note of Dr. Irizarry Rivera that Gonzalez was "able to take care of his personal hygiene, dress himself and [have] an adequate relationship with [his] partner."  (*Id.* at 21).

Accordingly, the ALJ adequately explained his specific findings that Gonzalez has a moderate limitation in his ability to concentrate, persist, and maintain pace, and a mild limitation in his ability to adapt or manage himself, and the decision will not be reversed on that ground.

### 2.  Explanation of Whether to Afford the Treating Physician's Opinions Controlling Weight

Gonzalez further contends that the ALJ erred because the ALJ did not give controlling weight to the opinion of his treating physician and failed to adequately explain that decision.

The opinions of a treating source should be given controlling weight if "the treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *Conte v. McMahon*, 472 F.Supp.2d 39, 48 (D. Mass. 2007).  Nevertheless, "the law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians" and they have discretion to resolve any evidentiary conflicts or inconsistencies. *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014) (quoting *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir.1991)).  When an ALJ does not give a treating source's opinion controlling weight, however, he or she must determine the amount of weight to give the opinion based on factors such as (1) the length of the treatment relationship, (2) whether the treating source provided evidence in support of the opinion, (3) whether the opinion is consistent with the record as a whole, and (4) whether the treating source is a specialist.  20

C.F.R. § 404.1527(c).  The ALJ must "give good reasons in [his] notice of determination or decision for the weight [he gives the] treating source's opinion," and should not discount that opinion entirely.  (*Id.*)  The ALJ must specifically articulate the reasons.  *See Linehan v. Berryhill*, 320 F. Supp. 3d 304, 306 (D. Mass. 2018) ("Where, as here, the Court cannot ascertain a clear understanding of why the ALJ rejected [the treating doctor's] opinion, the goal of the treating source rule is not met." (internal quotations omitted)); *Kem v. Berryhill*, 352 F. Supp. 3d 101, 112 (D. Mass. 2018);  *SSR* 96-2p, 1996 WL 374188, at *5 ("[T]he decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and *must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight*." (emphasis added)); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.");  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (noting that the court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician['s] opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). However, opinions that a claimant is "disabled or unable to work" are legal conclusions "reserved to the Commissioner because they are administrative findings that are dispositive of a case."  20 C.F.R. § 404.1527(d)(1).

    The ALJ gave two explanations for his decision not to give the opinions of Dr. Lopez Marquez controlling weight.  First, he stated that the opinions of Dr. Lopez Marquez, as well as those of Drs. Hugo Roman, Irizarry, Umpierre, and the medical professionals at First Hospital,

"are entitled to partial weight inasmuch as the findings of the physicians, psychiatrist, and psychologists support the above-related residual functional capacity." (A.R. at 25). Second, he stated that "Dr. Lopez['s] GAFs of 40-45 opinion are inconsistent with the claimant's detailed statement regarding his mental condition described in the psychiatrist's report[,] and refu[t]ed by the clinical signs o[f] the whole record." (*Id.* at 25).

Gonzalez contends that the ALJ's first explanation is not a "good reason" for rejecting the opinion of Dr. Lopez Marquez because it "[gives] partial weight to all and every mental opinion in the record[] only to the extent [it] . . . support[s] the invented residual functional capacity (RFC) that [the ALJ] created." (Mem. at 12). But that is not the only possible interpretation of his explanation. It is also possible that he meant that he was crediting only those parts of the opinions of medical professionals that are consistent with the record as a whole. As noted, if the opinion of a treating physician is not consistent with the record, the ALJ does not have to give it controlling weight. A third possibility is that the ALJ merely meant that he had credited those parts of those opinions that he had discussed earlier in his decision, although in that case, he would still need to explain the reasoning behind that decision. In any event, the statement is somewhat unclear, and on its own, might be insufficient to support the ALJ's decision not to give the opinions of Dr. Lopez Marquez controlling weight.

The second explanation the ALJ gave for discrediting the opinion of Dr. Lopez Marquez was that "Dr. Lopez['s] GAFs of 40-45 opinion are inconsistent with the claimant's detailed statement regarding his mental condition described in the psychiatrist's report[,] and refu[t]ed by the clinical signs o[f] the whole record." (*Id.* at 25). That statement is also somewhat unclear. It appears to address solely the ALJ's consideration of the GAF scores assessed by Dr. Lopez Marquez, and not his consideration of the rest of his opinions. It is possible that the ALJ meant

to say that Dr. Lopez Marquez's *opinions generally* (rather than his "*GAFs* of 40-45 *opinion*")
were "refu[t]ed by the clinical signs on the whole record," which would be a valid reason for
denying his opinions controlling weight, but as written, the explanation does not make that clear.

Furthermore, it is not clear from the explanation whether the ALJ thought that a higher or
lower GAF score was more consistent with the record.  He stated that "[t]he GAF scales of 50-60
from the First Hospital mental health professionals, suggestive of moderate symptoms[,] is
granted partial credibility inasmuch as the same are based on the objective medical evidence,
without taking into consideration the claimant's allegations," which appears to suggest that he
may have thought that the GAF scores should have been *higher*.  (*Id.* at 22, 123).  On the other
hand, the ALJ appears to have given more weight to the progress notes of Dr. Lopez Marquez
that documented less severe symptoms than he gave his progress notes documenting more severe
symptoms, which the ALJ did not mention in his decision.  (*Compare* A.R. at 25 (noting that the
treating psychiatrist indicated that claimant's concentration was not significantly decreased) *with
e.g.*, A.R. at 93 (finding inadequate concentration); *compare* A.R. at 25 (noting that the treating
psychiatrist had indicated that the claimant had expressed suicidal ideas, but there were no
structured plans or overt acts) *with* A.R. at 74 (treating psychiatrist's report discussing structured
plans)).

It is possible that the outcome of the proceeding may have been different had the
assessments of Dr. Lopez Marquez been given controlling weight.  For example, the ALJ
appears to have credited the finding of Dr. Lopez Marquez in his progress note from March 24,
2014, that the claimant's concentration was not significantly decreased, and that his insight was
adequate.  But in every other progress note Dr. Lopez Marquez found that Gonzalez's attention,
concentration, judgment and insight were inadequate, which the claimant contends that the ALJ

should have given controlling weight.

Accordingly, because the ALJ's explanations on the issue are somewhat unclear, and in light of the significance of the issue, the Court will reverse the decision and remand the matter for further proceedings. The Court expresses no view as to whether the ALJ should give the opinions of Dr. Lopez Marquez controlling weight on remand. For example, it may be that the record is inconsistent with his opinions, or that the length of his treatment of Gonzalez was not determined to be significant. The other medical professionals who examined Gonzalez did so relatively close in time to the assessments of Dr. Lopez Marquez, and appear to have assessed his symptoms differently. For example, Dr. Irizarry Rivera found that Gonzalez displayed coherent, relevant, and logical thought form, established a good rapport, and answered all questions during the evaluation; that he was not experiencing suicidal or homicidal ideations at the time of his examination; that his immediate, short term, and recent memory, as well as his attention and concentration levels, were adequate; and that his general knowledge, social judgement, and insight were slightly diminished. (*Id.* at 121-22). And Dr. Roman Rivera found that he presented as logical, coherent, well-oriented and with a good rapport, and had an adequate memory except for his short-term memory, good attention and concentration levels, and slightly diminished judgment and insight levels, and that the opinion of Dr. Lopez Marquez was without substantial support from other evidence of the record. (*Id.* at 141). But to the extent the ALJ finds that to be true, or has some other "good reason" to deny Dr. Lopez Marquez's opinions controlling weight, he must clearly explain it in his decision.[11]

---

[11] Gonzalez also contends that the ALJ erred because the ALJ ignored the progress notes of Dr. Lopez Marquez indicating that his attention, concentration, judgment and insight were inadequate and that the claimant was not oriented to time. (Mem. at 14). That contention overlaps with his second contention—that is, that the ALJ did not provide an adequate explanation for not giving the treating physician's opinion controlling weight. An ALJ is not required to discuss "every piece of evidence in the record that favors appellant." Santiago v. Sec'y of Health and Hum. Servs., 1995 WL 30568, at *4 (1st Cir. Jan. 25, 1995); Sousa v. Astrue, 783 F. Supp. 2d 226, 234 (D. Mass. 2011) ("The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in

III.    **Conclusion**

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final

decision of the Commissioner of the Social Security Administration is GRANTED, and the

Commissioner's motion to affirm the action is DENIED.

**So Ordered.**


Dated:  December 1, 2021                         /s/ F. Dennis Saylor IV
                                                 F. Dennis Saylor IV
                                                 Chief Judge, United States District Court

---

the record."); N.L.R.B. v. Beverly Enters.-Mass., 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.  Nor must an ALJ make 'explicit credibility findings' as to each bit of conflicting testimony, as long as his factual findings as a whole show that he 'implicitly resolve[d]' such conflicts.").  Likewise, the ALJ's decision need not address pieces of evidence that are cumulative of evidence already discussed, or that fail to support claimant's position.  Dube v. Astrue, 781 F. Supp. 2d 27, 35 (D.N.H. 2011).

Here, the ALJ did consider some of the evidence in the record that favors appellant.  (A.R. at 21) ("The claimant referred visual and auditory hallucinations, such as [] seeing shadows and hearing voices.").  As long as he gives a principled reason for not giving the treating physician's opinions controlling weight, he does not need to go over every piece of evidence the treating physician gave that favored appellant.